UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

ERNEST McWILLIAMS,

               Petitioner,

    -vs-

STATE OF NEW YORK

               Respondent.

_____

**DECISION AND ORDER**

**No. 09-CV-0239T**

## I.   Introduction

*Pro se* petitioner Ernest McWilliams ("Petitioner") has filed a timely petition for a writ of habeas corpus under 28 U.S.C. § 2254 challenging the constitutionality of his custody pursuant to a judgment entered September 8, 2004, in New York State, Supreme Court, Monroe County, convicting him, after a jury trial, of Murder in the Second Degree (N.Y. Penal Law ("Penal Law") § 125.25[1]), Criminal Possession of a Weapon in the Second Degree (Penal Law § 265.03[2]), and Criminal Possession of a Weapon in the Third Degree (Penal Law § 265.02[4]).

For the reasons stated below, habeas relief is denied and the petition is dismissed.

## II.  Factual Background and Procedural History

Petitioner's conviction arises from an incident that occurred on April 16, 2003 in Rochester, New York, in which thirty-two-year-old Eric "Punree" Williams ("Williams" or "the victim"), who lived

near the corner of Jay and Child Streets opposite the S&A Market, sustained gunshot wounds that resulted in his death.  Trial Trans. [T.T.] 1112-1114, 1324-1328, 1349.

A number of witnesses saw the victim involved in a confrontation with two other African-American men just before 11:30 a.m. on April 16, 2003, near the market at Jay and Child Streets.

One of the witnesses was thirteen-year-old Shaunda McCarthy ("McCarthy"), who was watching television at a friend's house across the street from the market when she heard what she thought were gunshots.  After going to the porch and looking across the street, McCarthy saw two men standing over Williams, whom she knew as "Punree," shooting him.  T.T. 796-800.

Sarah Schaffer ("Schaffer") was in her bathroom when she heard shots.  Looking out her window, Schaffer saw "Punree" on the ground.  Another man was shooting him while the other was kicking him.  T.T. 831-840.

Diane Christmas ("Christmas") testified that she saw two men approach Williams and "sandwich" him between the two of them. Christmas saw one of the men shoot Williams a number of times.  She then saw the two men run to a car and drive away.  She called 911. T.T. 956-964.

At about the same time, Julius Booker ("Booker") was working at a nearby food bank when he heard gunshots.  As Booker went to the door, he saw three men on the ground.  One of them got up and

shot one of the other two, then ran away.  The other two men appeared to be struggling over a gun.  When the gun was being pointed toward Booker, he stepped away from the door.  When he next looked, one man was left lying on the ground.  T.T. 1076-1084.

Jim Candella ("Candella") heard what he later discovered were gunshots as he was driving on Jay Street near Child Street. Candella saw a man walk quickly by him and get in a dark-colored car.  He was able to get the license plate number and called 911. He saw another man with a gun standing over a man on the ground. T.T. 866-881.

Jequan Patterson ("Patterson") was also driving in the area on his way to the Jay and Child Streets market.  As he was approaching the intersection, he saw a man walking across the street carrying some groceries.  Another man was crossing the street behind the man with the groceries.  When the man with the groceries turned around, the other man grabbed him and "then they began like a tussle."  A third man then joined the fight.  The three then went out of his view before he heard what sounded like firecrackers.  As Patterson traveled a little further in his vehicle, he heard a louder noise, or gunshot.  Turning, he could see the three men who were fighting. He saw one man get up, shoot toward the two men on the ground, then run away carrying a handgun.  A second man then got up and ran away, also carrying a handgun.  The third man stayed down. T.T. 917-924, 934-936.

Traveling in the car with Patterson was Jennifer Smith ("Smith").   Smith testified that as they approached the intersection of Jay and Child Streets, she noticed three African-Americans wrestling in the street in front of the grocery store. One of them got up and fired a shot, ran, then came back and fired another shot.  One of the other two then got up, stood over the man on the ground, fired shots at him, and then ran away with the first man who had fired the gun.  T.T. 1002-1012, 1035-1038.

After police arrived at the scene of the shooting, Williams was taken to Strong Memorial Hospital, where he died from his gunshot wounds.  Shortly after the victim was pronounced dead that same day between noon and 1:00 p.m., Rochester Police Department Officer Bryan Kehrig was approached by a woman who identified herself as Lisa McWilliams, and inquired as to whether Petitioner had been shot in the arm.  After a conversation with her, Officer Kehrig radioed the dispatcher to check with area hospitals regarding a "walk-in gunshot wound."  T.T. 1166-1176.

Later that day, at about 3:30 p.m., Rochester Police Department Investigator Randy Benjamin responded to Park Ridge Hospital where he met with Petitioner, who said he had been shot in the arm near his sister's house on Frost Avenue in Rochester at about 3:00 p.m. that day by a masked man who had chased him after getting out of a car.  Petitioner told another officer at the hospital that he was shot by one of two men as he was turning to

run away after walking towards the two who were involved in an argument.   Investigator Benjamin made arrangements for the defendant to meet him the next day regarding the shooting, but Petitioner did not appear for the appointment.  T.T. 623-634, 1203-1204.

A day after the shooting, on April 17, 2003, the car that was seen by the witnesses at the time of the shooting was discovered in a grocery market parking lot.  Petitioner's fingerprint was lifted from the seatbelt buckle.  T.T. 1205-1206, 1207-1221.

Four days later, on April 21, 2003, Rochester Police Department Investigator Thomas Cassidy interviewed Petitioner.  At that time, Petitioner reiterated to Investigator Cassidy that he was shot by a masked man near his sister's house.  T.T. 650-658.

About six months later, on September 18, 2003, police searched the home of Petitioner's uncle at 641 West Main Street in Rochester, pursuant to a search warrant, and recovered a .380 caliber handgun in the attic and a personal identification card belonging to Petitioner.  T.T. 1138-1149, 685-687.  Ballistics tests showed that spent casings found at the scene of the shooting, as well as the two projectiles removed from the victim's body during the autopsy, were fired from that gun.  T.T. 1268-1315.

On October 2, 2003, police found a .22 caliber bullet on the floor of Petitioner's bedroom at 141 Grand Avenue in Rochester, New York.  T.T. 1132-1137.  The bullet, a misfire, had the same firing

pin impression as exhibited on casings found at the scene of the shooting.  T.T. 1313-1315.

Also on October 2, 2003, after Petitioner had been read and waived his _Miranda_ rights, Investigator Cassidy interviewed Petitioner for a second time.  Although Petitioner first denied any involvement in the shooting death of Williams, after being confronted with the evidence gathered during the investigation, he admitted that he shot Williams.  In an oral statement that was reduced to a writing which Petitioner signed, he stated that he and Anthony Jenkins ("Jenkins") (who had died a few months earlier) drove together in a stolen car to the area of Jay and Child Streets because Petitioner wanted to talk to a man that lived on the corner about some stereos and televisions.  After getting out of the car, the victim, who, according to Petitioner, "was acting like he was high or drunk," asked Petitioner for cocaine.  Petitioner told the man that he did not have any and walked on.  Seconds later, he heard something behind him and then saw that Jenkins had grabbed the victim, who was waving and firing a gun that struck Petitioner in the arm.  Petitioner then pulled out his .380 handgun and shot the victim once before running for the car.  As he ran, he fired twice more as Jenkins and the victim wrestled for the victim's gun.  Petitioner then ran for the car, turned the car around, and waited for Jenkins.  When Jenkins got in the car thirty to forty seconds later, he was carrying a .22 caliber handgun, which was, according

to Petitioner, the same gun the victim shot Petitioner with.  The two men then fled.  In the car, Jenkins told Petitioner that the man he had jumped on was dead, and that he had jumped on him because he looked like he was going to rob Petitioner.  T.T. 687-747.

Petitioner presented no evidence at trial.  T.T. 1366-1370.

### B.   Pre-Trial Suppression Motion

Prior to trial, Petitioner moved to suppress physical evidence obtained pursuant to a search warrant and statements made by him to police.  A hearing was held and the trial court subsequently denied Petitioner's motion.  See Resp't App. B at 27-30, 56-58.

### C.   Conviction and Sentence

At the close of Petitioner's trial, he was found guilty as charged and sentenced to concurrent terms of imprisonment, the longest of which was an indeterminate term of twenty-five years to life.  Sentencing Mins. [S.M.] of 09/08/04 22.[1]

### D.   Direct Appeal

The Appellate Division, Fourth Department unanimously affirmed Petitioner's judgment of conviction on February 8, 2008.  People v. McWilliams, 48 A.D.3d 1266 (4th Dep't 2008) (Resp't App. E), lv. denied, 10 N.Y.3d 961 (2008) (Resp't App. H).

---

[1]     Petitioner was re-sentenced on November 16, 2004 to modify the period of post-release supervision.  See S.M. of 11/16/04; McWilliams, 48 A.D.3d 1268 (4th Dep't 2008).

### E.    The Habeas Corpus Petition

This habeas corpus petition followed, wherein Petitioner seeks relief on the following grounds: (1) the trial court erred in failing to suppress his confession to police because it was involuntary; (2) the prosecution failed to disclose discovery and Brady material; (3) the police improperly engaged in "judge shopping" with respect to the issuance of the September 2003 search warrant; (4) erroneous jury instructions; and (5) ineffective assistance of trial counsel. See Pet. ¶ 22, Grounds One-Five (Dkt. # 1).

## III. General Principles Applicable to Habeas Review

### A.    The AEDPA Standard of Review

Under the Anti-Terrorism and Effective Death Penalty Act ("AEDPA"), a federal court may grant habeas relief to a state prisoner only if a claim that was "adjudicated on the merits" in state court "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," 28 U.S.C. § 2254(d)(1), or if it "was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding." § 2254(d)(2). A state court decision is "contrary to" clearly established federal law "if the state court arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law or if the state court

decides a case differently than [the Supreme Court] has on a set of materially indistinguishable facts." Williams v. Taylor, 529 U.S. 362, 413 (2000).  The phrase, "clearly established Federal law, as determined by the Supreme Court of the United States," limits the law governing a habeas petitioner's claims to the holdings (not *dicta*) of the Supreme Court existing at the time of the relevant state-court decision. Williams, 529 U.S. at 412; accord Sevencan v. Herbert, 342 F.3d 69, 73-74 (2d Cir. 2002), cert. denied, 540 U.S. 1197 (2004).

A state court decision is based on an "unreasonable application" of Supreme Court precedent if it correctly identified the governing legal rule, but applied it in an unreasonable manner to the facts of a particular case. Williams, 529 U.S. at 413; see also id. at 408-10.  "[A] federal habeas court is not empowered to grant the writ just because, in its independent judgment, it would have decided the federal law question differently." Aparicio v. Artuz, 269 F.3d 78, 94 (2d Cir. 2001).  Rather, "[t]he state court's application must reflect some additional increment of incorrectness such that it may be said to be unreasonable." Id. This increment "need not be great; otherwise, habeas relief would be limited to state court decisions so far off the mark as to suggest judicial incompetence." Francis S. v. Stone, 221 F.3d 100, 111 (2d Cir. 2000) (internal quotation marks omitted).

Under AEDPA, "a determination of a factual issue made by a State court shall be presumed to be correct.  The [petitioner] shall have the burden of rebutting the presumption of correctness by clear and convincing evidence."  28 U.S.C. § 2254(e)(1);  see also Parsad v. Greiner, 337 F.3d 175, 181 (2d Cir. 2003) ("The presumption of correctness is particularly important when reviewing the trial court's assessment of witness credibility."), cert. denied sub nom. Parsad v. Fischer, 540 U.S. 1091 (2003).  A state court's findings "will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding." Miller-El v. Cockrell, 537 U.S. 322, 340 (2003).

## B.    Exhaustion Requirement

"An application for a writ of habeas corpus on behalf of a person in custody pursuant to a judgment of a State court shall not be granted unless it appears that . . . the applicant has exhausted the remedies available in the courts of the State. . . ." 28 U.S.C. § 2254(b)(1)(A);  see, e.g., O'Sullivan v. Boerckel, 526 U.S. 838, 843-44 (1999);  accord, e.g., Bossett v. Walker, 41 F.3d 825, 828 (2d Cir.1994), cert. denied, 514 U.S. 1054 (1995). "The exhaustion requirement is not satisfied unless the federal claim has been 'fairly presented' to the state courts." Daye v. Attorney General, 696 F.2d 186, 191 (2d Cir. 1982) (en banc), cert. denied, 464 U.S. 1048 (1984).

**C.    The Adequate and Independent State Ground Doctrine**

"It is now axiomatic that 'cases in which a state prisoner has defaulted his federal claims in state court pursuant to an independent and adequate state procedural rule, federal habeas review of the claims is barred.'" Dunham v. Travis, 313 F.3d 724, 729 (quoting Coleman v. Thompson, 501 U.S. 722, 750 (1991)).  A habeas corpus petitioner, however, may overcome a procedural default created by the state court's invocation of an "independent and adequate" basis for its decision by (1) showing cause for the default and prejudice attributable thereto, or (2) by demonstrating that a fundamental miscarriage of justice will ensue if the claim is not reviewed by the habeas court. See Harris v. Reed, 489 U.S. 255, 262 (1989) (citing cases).  The "fundamental miscarriage of justice" exception requires the petitioner to make a factual showing that he is "actually innocent" of the crime for which he was convicted.  See id.  It bears noting that "'actual innocence' means factual innocence, not mere legal insufficiency." Bousley v. United States, 523 U.S. 614, 623 (1998).

**IV.  Merits of the Petition**

**1.    Involuntary Confession**

Petitioner contends, as he did on direct appeal, that the hearing court erred in failing to suppress his confession to police because it was involuntary insomuch as he was questioned for over seventeen hours, deprived of sleep, and that the police delayed the

filing of an accusatory instrument and his arraignment in order to question him. <u>See</u> Pet. ¶ 22, Ground Three. The Fourth Department rejected this claim on the merits, finding, *inter alia*, that "the court properly refused to suppress [Petitioner's] oral and written statements made to the police." <u>McWilliams</u>, 48 A.D.3d at 1267.

The following facts were established at Petitioner's pre-trial suppression hearing: Petitioner was taken into custody by Rochester Police Department Officers at about 10:45 a.m. on October 2, 2003 outside his mother's house at 141 Grand Avenue in the City of Rochester; Petitioner was then transported to the Public Safety Building and placed in an interview room, where he remained alone until 12:05 p.m., except for a brief trip to the bathroom. Hr'g Mins. [H.M.] of 04/01/04 213-218, 229-234; H.M. of 04/12/04 20-22. From 12:05 to 12:30 p.m., Petitioner was interviewed by Investigator Woodward, who, after uncuffing Petitioner and obtaining from him a waiver of his <u>Miranda</u> rights, questioned him regarding allegations of intimidating a witness and criminal possession of a weapon, which Petitioner, who appeared normal and cooperative, denied; after completion of the interview, Investigator Woodard advised Investigator Cassidy that Petitioner had waived his <u>Miranda</u> rights. H.M. of 03/19/04 54-67. At 12:45 p.m., Investigator Cassidy, who had spoken to Petitioner on a prior occasion on April 21, 2003, in connection with his investigation into the homicide of Williams, began his interview of Petitioner;

after denying any involvement in the homicide during a lengthy interview, punctuated by frequent breaks, including for food and drink, bathroom use, and a nap, Petitioner admitted at about 11:46 p.m. to playing a role in the shooting of Williams on April 16, 2003; from that time until the interview was completed at 4:17 a.m., Petitioner expanded on his admission in detail and provided a written, signed statement.  H.M. of 03/19/04 128-176.

These factual findings describing what transpired between Petitioner and the police are supported by the record at the suppression hearing and are presumed to be correct.  See 28 U.S.C. § 2254(e)(1).  Petitioner has failed to rebut them with clear and convincing evidence.

The "ultimate issue of voluntariness [of a confession] is a legal question requiring independent federal determination." Nelson v. Walker, 121 F.3d 828, 833 (2d Cir.1997) (quoting Arizona v. Fulminante, 499 U.S. 279, 287 (1991));   see also Nova v. Bartlett, 211 F.3d 705, 707 (2d Cir. 2000);  Mincey v. Arizona, 437 U.S. 385, 398 (1978) (holding that the Court is not bound by a state court's determination that a statement was voluntary; instead, the Court is under a duty to make an independent evaluation of the record).  "'No single criterion controls whether an accused's confession is voluntary:  whether a confession was obtained by coercion is determined only after careful evaluation of the totality of the surrounding circumstances.'"  Nelson, 121 F.3d

at 833 (quoting <u>Green v. Scully</u>, 850 F.2d 894, 901 (2d Cir.), <u>cert.</u> <u>denied</u>, 488 U.S. 945 (1988)).  Factors to be considered include the accused's experience and education; the conditions of the interrogation; and the conduct of law enforcement officials, notably, whether there was physical abuse, the period of restraint in handcuffs, and use of psychologically coercive tactics.  <u>Id.</u> (citing <u>Green</u>, 850 F.2d at 901).  "'Subsidiary questions, such as the length and circumstances of [an] interrogation," or whether "'the police engaged in the intimidation tactics alleged by the defendant," are entitled to the presumption of correctness.'"  <u>Id.</u> (quoting <u>Miller v. Fenton</u>, 474 U.S. 104, 112, 117 (1985)); <u>see</u> <u>also</u> <u>Towndrow v. Kelly</u>, 2000 U.S. Dist. LEXIS 21969, 98-CV-0509 (N.D.N.Y. Dec. 20, 2000).

In this case, the Court finds that, under the totality of the circumstances, Petitioner's confession was voluntarily made. Although Petitioner was detained and questioned by police for approximately sixteen hours, he waived his <u>Miranda</u> rights, received frequent breaks in the questioning, was provided with food and drink, slept during one of the breaks, and was not restrained in any way.  Neither the conditions of the interrogation nor the conduct of the police support Petitioner's assertion that his confession was involuntary.

Accordingly, the Court cannot find that the state court's determination of this issue contravened or unreasonably applied settled Supreme Court law.  The claim is therefore dismissed.

### 2.  Prosecution Failed to Disclose Discovery and <u>Brady</u> Material

Petitioner argues, as he did in his *pro se* appellate brief, that the prosecutor failed to disclose discovery and <u>Brady</u> material, namely "search warrants, applications, and affidavits, with respect to the (April 21, 2003 search warrants and applications), which had no [p]rotective order sealing them at time of request."  Pet. ¶ 22, Ground Four.  The Fourth Department rejected this claim on the merits.  <u>See</u> <u>McWilliams</u>, 48 A.D.3d at 1267.

The record reflects that on September 18, 2003, police searched the home of Petitioner's uncle at 641 West Main Street in Rochester, New York, pursuant to a search warrant, and recovered a .380 caliber handgun in the attic and a personal identification card belonging to Petitioner.  T.T. 685-687, 1138-1149. Ballistics tests showed that spent casings found at the scene of the shooting, as well as the two projectiles removed from the victim's body during the autopsy, were fired from that gun.  T.T. 1268-1315. Part of the affidavit supporting the search warrant for Petitioner's uncle's house reflected information from a confidential informant, and the *in camera* testimony of said informant, was sealed.  <u>See</u> Resp't Ex. B at 15-17.  No issue

-15-

appears to be raised in the instant habeas petition regarding the sealing order or the September 2003 search of Petitioner's uncle's house.  Rather, the issue raised, as was raised in Petitioner's *pro se* appellate brief, relates to an earlier warrant application (in April 2003) for the search of another location, which was brought before a Judge Elma Bellini.

During the hearing on Petitioner's motion to suppress statements and physical evidence seized from Petitioner's home on October 2, 2003, it became apparent that the same confidential informant, whose *in camera* testimony formed the basis for the warrant authorizing the search of Petitioner's uncle house in September 2003, also supplied information to police that was used in a warrant application in April 2003 to search another location. The April 2003 warrant application, which was brought before Judge Bellini (a different judge than the one who signed the September 2003 warrant), was not signed because Judge Bellini wanted to question the confidential informant, who, out of fear, refused to go before the judge.  Following an *in camera* inquiry regarding the April 2003 application, the trial court denied Petitioner's motion for disclosure of the identity of the informant and that search warrant application.  H.M. of 3/31/04 23-46, 172-208; H.M. of 6/4/04 2-20;  Resp't App. B at 33-36.

As he did in his *pro se* supplemental appellate brief, Petitioner argues that the People failed to disclose search

warrants, applications, and affidavits with respect to the April 21, 2003 search warrant (as set forth above), in violation of Brady v. Maryland, 373 U.S. 83 (1963) and state discovery law. See Pet. ¶ 22, Ground Four.

While Petitioner casts this claim broadly as a violation of both federal and state law, characterizing the information at issue generically as "Brady or Discovery[-]type material," his claim is primarily grounded in state discovery law. A review of Petitioner's *pro se* appellate brief[2] reveals that the primary violations Petitioner complains of are those related to N.Y. Crim. Proc. L. ("CPL") § 240 (dealing with pre-trial disclosure) and the People's discovery obligations under People v. Rosario, 9 N.Y.2d 286 (1961). As such, Petitioner's claim is a matter of state law, which is not cognizable by this Court on habeas review. See Estelle v. McGuire, 502 U.S. 62, 68 (1991) ("In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States."); see also Goston v. Rivera, 462 F.Supp.2d 383, 394 (W.D.N.Y. 2006) ("[petitioner's] claim relating to the prosecutor's Rosario violation is not a federal constitutional claim cognizable on habeas review.") (citing Lyon v. Senkowski, 109 F.Supp.2d 125, 139 (W.D.N.Y. 2000)); Alston v. Ricks, 2003 U.S. Dist. LEXIS 38,

---

[2]      This claim, as set forth in the habeas corpus petition is supported by scant facts and/or argument.  Thus, to the extent needed to analyze this claim, the Court looks to Petitioner's *pro se* appellate brief, which contains a thorough discussion of this issue.  See Resp't App. C.

01 Civ. 9862 (GWG), at *16 (S.D.N.Y. Jan. 7, 2003) ("Alston's first ground for habeas relief must fail because the obligation to disclose Rosario material arises solely under state law.") (citing cases); Johnson v. Filion, 232 F. Supp.2d 98, 100 (S.D.N.Y. 2002) ("'Failure to turn over Rosario material is not a basis for habeas relief as the Rosario rule is purely one of state law.'") (citing Green v. Artuz, 990 F. Supp. 267, 274 (S.D.N.Y. 1998)).

Moreover, to the extent Petitioner raises the alleged discovery violation as a federal claim, the claim lacks merit. Under federal law, "there is no general constitutional right to discovery in a criminal case, and Brady, which addressed only exculpatory evidence, did not create one." Gray v. Netherland, 518 U.S. 152, 168 (1996) (internal quotations and citations omitted). The Due Process Clause of the United States Constitution simply has "little to say regarding the amount of discovery which the parties must be afforded." Id. (quoting Wardius v. Oregon, 412 U.S. 470, 474 (1973)).

Thus, this claim provides no basis for habeas relief and is dismissed.

### 3.   "Judge Shopping" Claim

Petitioner argues, as he did in his *pro se* appellate brief, that when the police applied for a search warrant in September 2003 they improperly engaged in "judge shopping" because they went to a different judge than the judge they went to in April 2003 (who

-18-

refused to sign the April 2003 warrant application), and failed to advise the second judge that the April 2003 warrant had been denied.   <u>See</u> Pet. ¶ 22, Ground Five.   The Fourth Department rejected this claim on the merits.   <u>See</u> <u>McWilliams</u>, 48 A.D.3d at 1267.

According to Petitioner's argument on appeal,[3] the procedure employed by the police in obtaining the September 2003 search warrant (i.e., the "judge shopping") violated New York Civil Law and Practice Rule 2217(b), which relates to ex parte motions.   <u>See</u> Pet. ¶ 22, Ground Five; Resp't App. B.   As the Respondent correctly contends, this claim, as argued on direct appeal, was not raised as or based upon the deprivation of any federal constitutional right(s); rather, it was framed and argued entirely as a violation of state law, relying on state law principles.   <u>See</u> Resp't Mem. at 15.   Accordingly, this Court cannot find that the state court was apprised of the federal constitutional dimension of Petitioner's claim, thus rendering it unexhausted for purposes of federal habeas corpus review.   <u>See</u> <u>Daye</u>, 696 F.2d at 192-94.   Nonetheless, as discussed below, because Petitioner no longer has a state court forum within which to exhaust the claim, the Court deems it exhausted but procedurally defaulted.   <u>See</u> <u>Grey</u>, 933 F.2d at 120.

---

[3]     Again, this Court looks to Petitioner's *pro se* appellate brief, which sets forth this argument in considerable detail, to understand the claim more fully.   <u>See</u> Resp't App. B.

Petitioner has already used his one direct appeal to which he is entitled under New York law.  See N.Y. Court Rules § 500.20. Collateral review of this claim -- by way of a motion pursuant to N.Y. Crim. Proc. L. ("CPL") § 440 -- is also barred because the claim is a matter of record that could have been raised on direct appeal, but unjustifiably was not.  See CPL § 440.10(2)(c) (the court must deny a motion to vacate a judgment when sufficient facts appear on the record to have permitted adequate review of the issue on appeal although no such review occurred due to Petitioner's unjustifiable failure to raise the issue on direct review).

A finding of procedural default bars habeas review of the federal claim unless Petitioner can show cause for the default and prejudice attributable thereto, or demonstrate that failure to consider the claim will result in a miscarriage of justice.  See Murray, 477 U.S. at 492;  Wainwright v. Sykes, 433 U.S. 72, 87-91 (1977).  Petitioner makes no showing of the requisite cause and prejudice to overcome the procedural default, nor has he demonstrated that the Court's failure to review the claim will result in a miscarriage of justice.  Petitioner's claim is therefore dismissed as procedurally defaulted.

**4.   Erroneous Jury Instructions**

Petitioner argues, as he did on direct appeal, that the trial court erred in instructing the jury as to the "initial aggressor" portion of New York's justification instruction insomuch as the

jury was erroneously instructed "that a nondeadly aggressor confronted with imminent deadly physical force has no right to defend himself." Pet. ¶ 22, Ground One. The Fourth Department rejected this claim on procedural grounds for failure to properly preserve the issue for appellate review.[4] See McWilliams, 48 A.D.3d at 1267. Consequently, this claim is procedurally barred from habeas review by this Court.

A federal court may not review a question of federal law decided by a state court if the state court's decision rested on a state law ground that is independent of the federal question and adequate to support the judgment. See Coleman, 501 U.S. at 729. Here, the Fourth Department rejected Petitioner's claim pursuant to CPL § 470.05(2) because the issue had not been properly preserved for appellate review. See McWilliams, 48 A.D.3d at 1267. The Second Circuit has determined that CPL § 470.05(2) is an independent and adequate state procedural ground. See Garcia v. Lewis, 188 F.3d 71, 79-82 (2d Cir. 1999); Velasquez v. Leonardo,

---

[4]    The Fourth Department rejected this claim, in the alternative, on the merits: "[I]n any event, we conclude that reversal is not required based on the court's justification charge, which mirrored the model charge set forth in 1 CJI(NY) 35.15. We agree with defendant that, where there is a reasonable view of the evidence that the defendant initiates nondeadly offensive force and is met with deadly physical force, the defendant may be justified in the use of defensive deadly physical force and that, in such cases, the term initial aggressor is properly defined as the first person in the encounter to use deadly physical force. We nevertheless conclude that, despite the absence of the word "deadly" for that part of the court's charge defining the term initial aggressor, the court's justification charge adequately conveyed to the jury that defendant could be justified in the use of deadly physical force to defend himself against deadly physical force initiated by the victim. Thus, the justification charge, viewed in its entirety, was a correct statement of the law." McWilliams, 48 A.D.3d at 1267 (internal citations and quotations omitted).

898 F.2d 7, 9 (2d Cir. 1990).  The Fourth Department's reliance on New York's preservation rule is an adequate and independent state ground which precludes this Court's review of Petitioner's claim.

As discussed above, a finding of procedural default bars habeas review of the federal claims unless Petitioner can show cause and prejudice, or demonstrate that failure to consider the claim will result in a miscarriage of justice.  Petitioner has not attempted to avail himself of the "miscarriage of justice" exception.  While he does not specifically allege ineffective assistance of counsel as cause for the default, he does raise ineffective assistance of trial counsel as a stand-alone claim on the basis that counsel failed to object to the allegedly erroneous portion of the court's justification instruction.  See Pet. ¶ 22, Ground Two.  Indeed, ineffective assistance of counsel may constitute cause for a petitioner's failure to pursue a constitutional claim, e.g., Edwards v. Carpenter, 529 U.S. 446 (2000), but in order to constitute cause, counsel's ineffectiveness must itself rise to the level of a constitutional violation.  Id. Here, Petitioner's stand-alone claim that his attorney was ineffective for failing to object to the allegedly erroneous portion of the court's justification instruction is without merit (see Section "IV, 5" below).  Because Petitioner does not show that his trial attorney was constitutionally ineffective, he consequently cannot establish "cause" to excuse the procedural

default.  See Zayas v. Ercole, 2009 U.S. Dist. LEXIS 127012, 08-CV-1037 (CBA) at *39 (E.D.N.Y. Nov. 9, 2009) ("Since petitioner's trial counsel's performance was, in the aggregate, reasonable . . . petitioner cannot establish cause for his failure to preserve the claim."). This claim, therefore, is dismissed as procedurally defaulted.

### 5. Ineffective Assistance of Trial Counsel

Petitioner argues, as he did on direct appeal, that he received ineffective assistance of counsel because trial counsel failed to object to the "initial aggressor" portion of the trial court's justification charge.  See Pet. ¶ 22, Ground Two.  The Fourth Department rejected this claim on the merits.  See McWilliams 48 A.D.3d at 1267.

To establish that he was deprived of his Sixth Amendment right to the effective assistance of trial counsel, a petitioner must show that (1) his attorney's performance was deficient, and that (2) this deficient performance prejudiced his defense.  Strickland v. Washington, 466 U.S. 668, 687 (1984). Deficiency is measured by an objective standard of reasonableness, and prejudice is demonstrated by a showing of a "reasonable probability" that, but for counsel's unprofessional errors, the result of the trial would have been different.  Id. at 694.  "A reasonable probability is a probability sufficient to undermine confidence in the outcome of the proceeding."  Id.  To succeed, a petitioner challenging

counsel's representation must overcome a "strong presumption that [his attorney's] conduct falls within the wide range of reasonable professional assistance." Id. at 689.  A reviewing court "must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct," id., and may not second-guess defense counsel's strategy. Id. at 690.

Moreover, the Second Circuit has held:

> [C]ounsel's failure to object to a jury instruction (or to request an additional instruction) constitutes unreasonably deficient performance only when the trial court's instruction contained 'clear and previously identified errors.' Conversely, when a trial court's instruction is legally correct as given, the failure to request an additional instruction does not constitute deficient performance.

Aparicio, 269 F.3d at 99 (citations omitted).  When considering whether the trial court's instructions contained "clear and previously identified errors," any challenged instruction must be considered in light of the full set of jury instructions and the trial record as a whole.  See, e.g., Victor v. Nebraska, 511 U.S. 1, 5 (1994);  Cupp v. Naughten, 414 U.S. 141, 146-47 (1973); Gaines v. Kelly, 202 F.3d 598, 606 (2d Cir. 2000).

Here, trial counsel's failure to object to the "initial aggressor" portion of the justification charge did not render his performance constitutionally ineffective.  This Court cannot find that trial counsel even erred by failing to object because the

justification charge was proper; it was in accordance with Penal Law § 35.15 and mirrored the model charge set forth in 1 CJI (NY) 35.15.  Moreover, even if Petitioner's failure to object to the allegedly erroneous portion of the justification instruction did render his assistance constitutionally deficient, it did not result in prejudice to the defendant and therefore does not give rise to ineffective assistance of counsel under Strickland. See United States v. Chin, 224 F.3d 121, 125 (2d Cir. 2000) (counsel's performance not constitutionally ineffective where the court was "not convinced that but for counsel's alleged errors the result of the proceeding would have been different").  Had an objection to the "initial aggressor" portion of the charge been made and sustained, and a further instruction given with respect to when a nondeadly aggressor may be justified in the use of defensive deadly physical force, it would not have changed the outcome of the proceeding.  There was substantial evidence presented at trial that disproved Petitioner's justification defense, and the probability of a different result due to trial counsel's failure to object to the "initial aggressor" portion of the justification instruction is insufficient to undermine confidence in the proceeding.  See, e.g., Williams v. Conway, 2007 U.S. Dist. LEXIS 59550, No. 02-CV-0755, at *56 (W.D.N.Y. Aug. 14, 2007) (Habeas petitioner was not prejudiced by trial counsel's failure to request a specific justification instruction concerning the use of deadly force to

effectuate an arrest because, "given the overwhelming evidence presented by the prosecution that negated the critical element of 'reasonableness' that is present in [all justification defenses], there [was] no reasonable probability that the outcome would have been different had the jury been instructed on the elements" of that specific justification defense."); Vassell v. McGinnis, 2004 U.S. Dist. LEXIS 26473, No. 04-CV-0856, at *32 (E.D.N.Y. Dec. 22, 2004) (trial counsel was not ineffective for failing to request a broader instruction regarding justification in connection with non-aggressors, because habeas petitioner did not show that there was a "reasonable probability that, but for counsel's failure . . . , the result of the proceeding would have been different.").

Thus, this Court cannot find that the Fourth Department's adjudication of this claim contravened or unreasonably applied settled Supreme Court law, and the claim is therefore dismissed.

## V.   Conclusion

For the reasons stated above, the petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 is denied, and the petition is dismissed. Because Petitioner has failed to make "a substantial showing of a denial of a constitutional right," 28 U.S.C. § 2253(c)(2), the Court declines to issue a certificate of appealability. See, e.g., Lucidore v. New York State Div. of Parole, 209 F.3d 107, 111-113 (2d Cir. 2000). The Court also hereby certifies, pursuant to 28 U.S.C. § 1915(a)(3), that any

appeal from this judgment would not be taken in good faith and therefore denies leave to appeal as a poor person. <u>Coppedge v. United States</u>, 369 U.S. 438 (1962).

Petitioner must file any notice of appeal with the Clerk's Office, United States District Court, Western District of New York, within thirty (30) days of the date of judgment in this action. Requests to proceed on appeal as a poor person must be filed with United States Court of Appeals for the Second Circuit in accordance with the requirements of Rule 24 of the Federal Rules of Appellate Procedure.

**IT IS SO ORDERED.**

S/Michael A. Telesca

_____
HONORABLE MICHAEL A. TELESCA
United States District Judge

DATED:     March 8, 2011
           Rochester, New York